## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEVYANI MEHTA, | ) |
| | ) |
| Plaintiff, | ) Case No. _19-cv-9091_ |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| NRC GROUP HOLDINGS CORP, JAMES R. | ) |
| BAUMGARDNER, CHRISTIAN T. | ) |
| SWINBANK, JAMES O'NEILL III, C. | ) |
| ALEXANDER HARMAN, GLENN M. SHOR, | ) |
| JOHN ROSS RAPAPORT, DANIEL J. | ) |
| HENNESSY, DONALD GLICKMAN, and | ) |
| MICHAEL J. BAYER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Devyani Mehta, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against NRC Group Holdings Corp. ("NRCG" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with NRCG, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of NRCG by US Ecology, Inc., U.S. Ecology Parent, Inc. ("Parent"), and Rooster Merger

1

Sub, Inc. and ECOL Merger Sub., Inc. (the "Merger Subs") (collectively "US Ecology").

2.     On June 24, 2019, NRCG announced that it had entered into an agreement and plan of merger (the "Merger Agreement") with U.S. Ecology, pursuant to which the Company will merge with and into U.S. Ecology, with U.S. Ecology continuing as the surviving corporation (the "Proposed Transaction").

3.     On June 23, 2019, the Board caused the Company to enter into the Merger Agreement with US Ecology.  Pursuant to the terms of the Merger Agreement, NRCG's shareholders will be entitled to receive 0.196 shares of common stock in the combined company for each share of NRCG common stock they own, an estimated exchange rate of $12.00.

4.     Upon consummation of the merger, each share of U.S. Ecology common stock will be converted into a share of common stock in the combined company, and each share of NRCG common stock will be converted into the right to receive 0.196 shares of common stock in the combined company per share of NRCG common stock, an exchange ratio of approximately $12.00 per share of NRCG common stock based on the price of U.S. Ecology's common stock at the time the Proposed Transaction was announced (the "Merger Consideration").

5.     On or about September 19, 2019, in order to convince NRCG's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.     In particular, the Proxy contains materially incomplete and misleading information concerning the valuation analyses performed by NRCG's financial advisors, Evercore Group L.L.C. ("Evercore") regarding the Proposed Transaction.

7.     The Proposed Transaction is expected to close early in the Fourth Quarter of this year and the special meeting of the Company's shareholders to vote on the Proposed Transaction is

scheduled to occur on October 22, 2019.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to NRCG's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

10.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

11.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, NRCG's common stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## **PARTIES**

12.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of NRCG common stock.

13.     Defendant NRCG is a public company incorporated under the laws of Delaware with principal executive offices located at 952 Echo Lane, Suite 460, Houston, Texas 77024.  NRCG's common stock is traded on the NYSE under the ticker symbol "NRCG."

14.     Defendant James R. Baumgardner ("Baumgardner") is, and has been at all relevant times, a director of the Company and Chairman of the Board.

15.     Defendant Christian T. Swinbank ("Swinbank") is, and has been at all relevant times, the Company's Chief Executive Officer and President, and a director of the Company.

16.     Defendant James O'Neill III ("O'Niell") is, and has been at all relevant times, a director of the Company.

17.     Defendant C. Alexander Harman ("Harman"), and has been at all relevant times, a director of the Company.

18.     Defendant Glenn M. Shor ("Shor") is, and has been at all relevant times, a director of the Company.

19.     Defendant John Ross Rapaport ("Rapaport") is, and has been at all relevant times, a director of the Company.

20.     Defendant Daniel J. Hennessy ("Hennessy") is, and has been at all relevant times, a director of the Company.

21. Defendant Donald Glickman ("Glickman") is, and has been at all relevant times, a director of the Company.

22. Defendant Michael J. Bayer ("Bayer") is, and has been at all relevant times, a director of the Company.

23. The Defendants identified in paragraphs 13 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Background of the Company and the Proposed Transaction**

24. NRC is a global provider of a wide range of environmental, compliance, and waste management services. NRCG's broad range of capabilities and global reach enable it to meet the critical needs of more than 5,000 customers across diverse end markets to ensure compliance with environmental, health, and safety laws and regulations around the world. Proxy, 15.

25. NRCG was established in June 2018 after the completion of the combination of NRCG's predecessor NRC and Sprint Energy Services, who while operating separately, had been working together under a collaboration agreement since 2015.

26. Prior to October 17, 2018, the business and assets of what is now NRCG were owned by JFL Partners or other investment affiliates of J.F. Lehman & Company, LLC ("JFLCo"), including the JFL Entities. On October 17, 2018, all of the outstanding equity interests were acquired from JFL Partners in a Special Purpose Acquisition Company transaction ("SPAC Transaction") by HCAC, a special purpose acquisition company ("SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Upon the closing of the SPAC Transaction, the JFL Entities beneficially owned approximately 67% of NRCG.

27.     Prior to the announcement of the Proposed Transaction, NRCG had exceptional long-term prospects.  Indeed, as the Company announced in its May 7, 2019 Press Release entitled *NRC Group Reports First Quarter 2019 Financial Results*, the Company recently closed on the acquisition of OIT, Inc. ("OIT") just two months before the Proposed Transaction was announced.  In OIT, the Company acquired a provider of thermal treatment of non-hazardous petroleum contaminated soils, absorbent pads and sludges, and the treatment of Per- and Polyfluoroalkyl substances ("PFAS").  This acquisition further strengthened the Company's operations in Alaska by providing a differentiated service offering and the opportunity to significantly grow the Company's earnings over the next few years due to the high demand for PFAS treatment.

28.     Thus, the Proposed Transaction comes at a time when NRCG's recent and future success was not fully reflected by its share price.  The Proposed Transaction will "compensate" NRCG stockholders with an amount of stock in the combined company that fails to adequately compensate them for the intrinsic value of their shares.

29.     Despite NRCG's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that deprives NRCG's stockholders of the ability to partake in NRCG's individual growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Background of the Proposed Transaction**

30.     On March 2, 2019, Baumgardner "had telephonic discussions with each of" Jeffrey Feeler ("Feeler"), US Ecology's Chairman of the Board, President and Chief Executive Officer, and Simon Bell ("Bell"), US Ecology's Executive Vice President and Chief Operating Officer, regarding general industry trends and the possibility of a strategic transaction.  Proxy, 72.

6

31.     On March 21, 2019 and March 25, 2019, NRCG and US Ecology executed confidentiality agreements providing for the confidential treatment of information of NRCG provided to US Ecology and confidential treatment of information of US Ecology provided to NRCG, respectively, in connection with the parties' exploration of a potential strategic transaction.  Proxy, 73.  The Proxy does not state whether these confidentiality agreements included standstill provisions and, if so, whether those standstill provisions included "Don't Ask, Don't Waive" ("DADW") provisions.

32.     On April 3, 2019, the NRCG Board held a regularly scheduled quarterly meeting at NRCG's headquarters in Houston during which Shor informed the non-management members of the NRCG Board that he and other members of NRCG's Board and management had engaged in "preliminary discussions with US Ecology," but that "material terms, such as price and the specific form and type of consideration, had not yet been discussed, other than the fact that US Ecology indicated that at least part, if not all, of the proposed consideration would likely consist of ECOL Common Stock.".  Proxy, 73.  Following this discussion, the Board directed Shor to continue to engage in discussions regarding a potential strategic transaction and, "over the course of the next two weeks, as directed by the NRCG Board, Messrs. Baumgardner, Shor and Harman and certain officers of NRCG continued to engage in discussions with representatives of US Ecology regarding a potential strategic transaction."  *Id.*

33.     In the morning of April 19, 2019, "representatives of NRCG's management, Mr. Shor, Jones Day, NRCG's regular legal counsel, and Evercore, financial advisor to NRCG, had a telephonic meeting regarding the potential strategic transaction," during which the parties discussed "the potential mix of consideration" that would be included.  Proxy, 74.

34.     On April 19, 2019, U.S. Ecology submitted to NRCG an Initial Officer of Indication ("IOI") to acquire all of NRCG's equity for $11.05 per share of NRCG Common Stock, representing

"an overall enterprise value of NRCG of $892 million." Proxy, 74. The IOI did not address whether the purchase price would be in the form of a fixed or variable exchange ratio. *Id.*

35. On April 23, 2019, the NRCG Board held a special telephonic meeting to discuss the US Ecology IOI, where Baumgardner "reminded the NRCG Board that he previously served in numerous senior management roles at US Ecology, including serving as president, chief executive officer, chief operating officer, chief financial officer and a member of the board of directors, until his departure in 2012," though he further indicated that "he had not had any economic interests in US Ecology for a number of years." Proxy, 74. The Proxy does not state when Baumgardner initially disclosed his connection with US Ecology to the NRCG Board, and does not state whether the NRCG Board was aware of Baumgardner's connections with US Ecology when it directed him to continue to engage US Ecology in discussions regarding a potential strategic transaction during its April 3, 2019 board meeting. After deliberations, the Board "unanimously resolved to create a transaction committee of the NRCG Board (the "Transaction Committee"), to be comprised of Messrs. Baumgardner, Shor and Harman," who were "appointed because of their knowledge of the operations of NRCG and the industry in which it operates, as well as their extensive experience in negotiating strategic transactions." *Id.* The Proxy does not state whether the Board considered Baumgardner's extensive connections with US Ecology at the time it resolved to make him a member of the Transaction Committee.

36. On May 29, 2019, Feeler telephoned Shor "to inform him that US Ecology was still interested in pursuing a potential strategic transaction with NRCG, but that it needed more time to revise its proposal and anticipated providing its updated valuation to NRCG during the first week of June." Proxy, 76.

37. On May 30, 2019, at the NRCG Board meeting, "Shor provided an update on the status of due diligence related to the potential strategic transaction with US Ecology," and informed

the Board that the Transaction Committee expected US Ecology's updated proposal the following week.  Proxy, 76.  The Board "also discussed other opportunities available to NRCG, including potential acquisitions."  *Id.*  The Proxy does not state the substance of the discussion of these "other opportunities," does not state whether NRCG had received any interest from competing counterparties, and does not state whether NRCG's Board, Management, counsel, or financial advisors had reached out to other potential counterparties to gauge interest in a potential strategic transaction with any potential counterparties other than US Ecology.

38.     On June 2, 2019, US Ecology's informed NRCG that US Ecology "did not intend to increase its current proposed per share purchase price."  Proxy, 77.  After learning that US Ecology's updated proposal was to be "based on an implied value of $11.05 per share of NRCG Common Stock at a fixed exchange ratio based on such price per share," Shor "stated that NRCG was not prepared to further engage in a potential strategic transaction at that valuation."  Proxy, 77.

39.     On June 4, 2019, Harman "received an unsolicited email from a former NRCG executive who had been contacted by a representative of Company A inquiring whether the JFL Entities would be interested in selling its interests in NRCG.  The proposal set forth in the email communication from Company A was not for all of the outstanding equity interests in NRCG but limited to only the shares of NRCG Common Stock held by the JFL Entities."  Proxy, 77.  The Proxy does not state the exact proportion of NRCG's outstanding equity that was encompassed by NRCG Common Stock held by the JFL Entities on June 4, 2019, and does not state the amount of consideration per share contemplated by the proposal.  Also on June 4, 2019, Company A indicated in a telephonic meeting with representatives of the JFL Entities that Company A was "highly interested in pursuing an acquisition of NRCG and may be willing to acquire not only the shares of NRCG Common Stock held by the JFL Entities but, alternatively, all of the outstanding equity interests of NRCG."  Proxy, 77.  The Proxy does not identify the "representatives of the JFL Entities"

who were party to this discussion with Company A, and does not state whether Company A's outstanding equity proposal contemplated an amount of consideration per-share equal to the amount of consideration per share contemplated by its JFL Entities-specific proposal.

40.     On June 5, 2019, Shor informed a representative of Houlihan Lokey, US Ecology's financial advisors, that "a strategic third-party had expressed interest in acquiring interests in NRCG for cash, but that NRCG would be willing to reengage with US Ecology if US Ecology increased its proposed valuation to at least $12.00 per share of NRCG Common Stock."  Proxy, 77.

41.     On June 6, 2019, the Transaction Committee, officers of NRCG, and representatives of Jones Day, held a telephonic meeting and discussed US Ecology's unwillingness to increase its proposed valuation of $11.05.  Proxy, 77.  At this meeting, Harman "informed the Transaction Committee of the unsolicited proposal that the JFL Entities, in their capacity as a stockholder of NRCG, had received from Company A," and further "informed the Transaction Committee that the JFL Entities were willing to delay making any independent decision on a transaction with Company A until after the Transaction Committee had fully explored a potential strategic transaction with US Ecology."  *Id.*  After deliberating, the Transaction Committee "resolved to inform US Ecology of the unsolicited proposal from Company A and that the Transaction Committee would be willing to continue to explore a potential strategic transaction exclusively with US Ecology so long as US Ecology increased its proposed valuation to at least $12.00 per share of NRCG Common Stock."  *Id.*

42.     Later that day, representatives of US Ecology informed Shor that "US Ecology was willing to increase its proposed purchase price to an implied value of $12.00 per share of NRCG Common Stock in exchange for JFL Partners waiving its right to any remaining payment obligations (up to $25.0 million) from NRCG under Section 5.18(b) of the 2018 Purchase Agreement, exclusivity through June 24, 2019 and an agreement by NRCG to devote the resources required to promptly address US Ecology's outstanding due diligence requests."  Proxy, 78.

43.     On June 7, 2019, NRCG and US Ecology executed an exclusivity agreement that granted US Ecology exclusivity to negotiate with NRCG through 11:59 Boise time on June 24, 2019.

44.     Over the next two weeks, NRCG and US Ecology negotiated the terms of the merger and the exact exchange ratio, Proxy, 77-81, with US Ecology taking the initial position that it should be based on a fixed exchange ratio of 0.191, NRCG countering that it should be based on a fixed exchange ratio of 0.2008, and the parties ultimately agreeing upon a fixed exchange ratio of 0.196, which "based on the ECOL Common Stock average share price over the last 15-trading days represented a price of $12.00 per share of NRCG Common Stock."  Proxy, 81-82.

45.     On June 23, 2019, the Transaction Committee held a telephonic meeting, at which it "unanimously recommended that the NRCG Board approve the final Merger Agreement, the Support Agreement, the Investor Agreement and the Registration Rights Agreement and recommend that the NRCG common stockholders adopt the Merger Agreement."  Proxy, 82.  Following this meeting, the NCRG Board held a telephonic meeting, at which it "determined that the Merger Agreement is fair to and in the best interests of NRCG and holders of NRCG Common Stock," and "approved the Merger Agreement, the Support Agreement, the Investor Agreement and the Registration Rights Agreement and resolved to recommend that holders of NRCG Common Stock approve the Merger Agreement, by a vote of eight to one, with John Rapaport, the NRCG Series A Preferred Stock director designee, dissenting."  Proxy, 82-84.

46.     On June 24, 2019, NRCG and US Ecology issued a joint press release announcing the Proposed Transaction:

> US ECOLOGY AND NRC GROUP AGREE TO MERGE, EXPANDING LEADERSHIP IN SPECIALTY AND INDUSTRIAL WASTE SERVICES
>
> BOISE, Idaho and HOUSTON, Texas, June 24, 2019 (GLOBE NEWSWIRE -- US Ecology, Inc. (Nasdaq-GS: ECOL) today announced that it has entered into a definitive merger agreement with NRC Group Holdings Corp. (NYSE American: NRCG), a national leader in comprehensive environmental, compliance and waste management services to the marine

and rail transportation, general industrial and energy industries, in an all-stock transaction with an enterprise value of $966 million. The transaction is expected to close in the fourth quarter of 2019 and is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, respective stockholder approvals and other customary closing conditions. The transaction will create a nationwide leader in industrial and hazardous waste management services and is projected to be mid-single digit accretive to US Ecology's 2020 adjusted earnings per share, before synergies.

"The addition of NRCG's substantial service network strengthens and expands US Ecology's suite of environmental services," said Jeffrey R. Feeler, President, Chief Executive Officer and Chairman of US Ecology. "This transaction will establish US Ecology as a leader in standby and emergency response services and adds a new waste vertical in oil and gas exploration and production landfill disposal to further drive waste volumes throughout the Gulf region."

NRCG is one of two leading national Oil Spill Removal Organizations ("OSRO") that provide mandated standby emergency response for the transportation of oil products.  With more than 50 service centers, NRCG has a national service network providing emergency and spill response, light industrial services, hazardous and industrial waste management and transportation services.  From a growing base of disposal assets in the two key oil basins in the Gulf region, the Permian and the Eagle Ford, NRCG provides landfill disposal of waste from oil and gas drilling, treatment and handling of residual waste streams and rental and transportation services to support its disposal operations.

"NRCG will bring highly complementary services and customers to US Ecology and will position the combined company as a leading player in industrial waste management while strengthening its position in the overall environmental services market," said Christian T. Swinbank, President and Chief Executive Officer of NRCG. "We believe the combination will provide compelling upside for stockholders of both companies."

The transaction has been approved by both companies' Boards of Directors. Upon completion of the transaction, US Ecology stockholders will own approximately 70% of the combined company, and NRCG stockholders will own approximately 30% on a fully diluted basis. The combined company will use the US Ecology name, and its shares will continue to be listed on the Nasdaq Global Select Market under the ticker ECOL.  Jeffrey R. Feeler will continue to serve as President, Chief Executive Officer and Chairman of the Board of Directors. The company will maintain its headquarters in Boise, Idaho with regional support centers in Boise, Detroit, New York and Houston.

Strategic Benefits

- Will expand leadership in specialty and industrial waste services. This merger supports US Ecology's vision of becoming the premier provider of comprehensive environmental services by adding high quality landfill disposal assets, a complementary new oil and gas exploration and production ("E&P") waste stream, and an expanding scale of key service verticals that drive volume to US Ecology's fixed facilities.

- Will establish a leadership position in marine and land-based emergency response, including a premier standby network. As a nationally-recognized OSRO, NRCG generates a recurring, compliance-driven revenue stream, with upside from spill events and international expansion,

12

particularly in Mexico and Canada. The acquisition adds over 50 additional service sites that provide emergency response ("ER"), "light" industrial services and waste handling to drive recurring base business through US Ecology's national service network.

- Will Provide National Service Network, which is Consistent with US Ecology's Growth Strategy.  The addition of over 50 service sites will provide a platform to support other field services offered by US Ecology, including retail compliance, lab pack, and LTL waste transportation.

- Will provide significant opportunities for synergies, with ROIC projected to exceed the cost of capital in the first full year.  This is a highly accretive transaction with synergies of approximately $20 million and potential for upside through realization of additional revenue and cross-selling opportunities.

- Will draw upon the collective talents of both companies. The combination of US Ecology and NRCG is intended to create a best-of-breed enterprise that will harness the experience and expertise of each organization to ensure that customers benefit fully from their complementary capabilities.

Financial Highlights

NRCG's pro forma revenue and adjusted EBITDA, as reported, were approximately $389 million and $91 million, respectively, for the year ended December 31, 2018, which includes pro forma adjustments for its 2018 acquisitions. NRCG is expected to contribute approximately $120 million to US Ecology's adjusted EBITDA in the first full year following the combination and be accretive in the mid-single digits to US Ecology's 2020 adjusted earnings per share, before synergies. Adjusted EPS excludes transaction, integration and other nonrecurring expenses.

Terms of the Transaction

Under the terms of the merger agreement, US Ecology will form a new holding company which will take the name of US Ecology, Inc. immediately upon the closing of the transaction and will own both US Ecology and NRCG.

US Ecology stockholders will receive 1 share of common stock of the new holding company for each share of US Ecology common stock they own upon closing of the transaction.

NRCG common stockholders will receive 0.196 shares of common stock of the new holding company for each share of NRCG common stock they own upon closing of the transaction.  The exchange ratio represents a price of $12.00 per share of NRCG stock, based on the US Ecology average share price over the last 15-trading days.  The $12.00 price per share represents a premium of approximately 36% to NRCG's June 21, 2019 closing price of $8.83.

Each share of NRCG's 7.00% Series A Convertible Cumulative Preferred Stock is expected to be converted in the merger into approximately 1.8 common shares of the new holding company.

NRCG's 19.249 million outstanding Warrants to purchase NRCG common stock will be converted to 3.773 million Warrants to purchase common stock of the new holding company, with a strike price of $58.67 each.

13

The transaction will provide NRCG stockholders with continued participation in the future prospects expected to result from the combination through their ownership of approximately 30% of the stock of the new holding company, on a fully diluted basis.

US Ecology will refinance NRCG's existing senior credit facilities through a new Term Loan B. Wells Fargo Securities, LLC and Bank of America Merrill Lynch, have agreed to provide committed financing for the transaction. The transaction is not subject to a financing contingency.

Advisors

Bank of America Merrill Lynch and Houlihan Lokey are serving as US Ecology's financial advisors and Dechert LLP is serving as legal counsel. Evercore is serving as NRCG's financial advisor and Jones Day is serving as legal counsel. Wells Fargo Securities, LLC and Bank of America Merrill Lynch are acting as Joint Lead Arrangers for the financing.

**The Preclusive Deal Protection Devices**

47.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

48.     Section 5.04 of the Merger Agreement is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

49.     Section 5.04(a) of the Merger Agreement strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

50.     Sections 5.04(b) and (c) of the Merger Agreement require the Board to provide US Ecology with written notice of any Alternative Proposal within twenty-four (24) hours of its receipt. Sections 6.4(d) and (e) likewise require the Board to provide prior written notice of at least five (5) business days of its intention to terminate the Merger Agreement in favor of any Takeover Proposal and negotiate with US Ecology following US Ecology's receipt of the notice, so that US Ecology has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Takeover

Proposal ceases to be a Superior Proposal.

51.     In addition, the Merger Agreement provides that the Company will be required to pay to US Ecology a termination fee of $35,000,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement.

52.     The Merger Agreement also provides that the Company will be required to pay to US Ecology the same termination fee, $35,000,000.00, in the event that an alternative proposal by another potential counterparty is publicly disclosed, the Company's stockholders do not vote in favor of adopting the Merger Agreement, and the Company subsequently enters into an alternative acquisition agreement pursuant to that alternative proposal within 12 months after the Merger Agreement is terminated.

53.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public stockholders' ability to disapprove the Proposed Transaction.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

54.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

55.     On or about August 1, 2019, in order to convince NRCG's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

56.     The special meeting of NRCG stockholders to vote on the Proposed Transaction is

forthcoming.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

57.    Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) financial information that renders Evercore's fairness analysis materially false, misleading, or incomplete.

### A.    The Proxy Omits Material Information Regarding the Background of the Proposed Transaction

58.    The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

59.    The Proxy fails to disclose whether these confidentiality agreements included standstill provisions and, if so, whether those standstill provisions included "Don't Ask, Don't Waive" ("DADW") provisions.  This information is material to shareholders deciding how to vote on the Proposed Transaction because the existence of standstill agreements artificially reduces the trading price of common stock by suppressing the market forces that would otherwise allow purchasing to drive up the trading price.  *See, e.g., Enterra Corp. v. SGS Associates*, 600 F. Supp. 678, 687-88 (E.D. Pa. 1985) ("Often an investor's substantial purchases of the corporation's stock initially will cause the market price of the stock to rise, and it becomes more costly for the investor to acquire additional stock.").  Further, assuming there were standstill agreements in place, the existence of "Don't Ask, Don't Waive" provisions would limit the Board's statutory and fiduciary obligations to attempt to maximize shareholder value.  *See, Koehler v. NetSpend Holdings, Inc.*, C.A.

No. 8373-VCG, 2013 Del. Ch. LEXIS 131, at *66-72 (Del. Ch. Ct. May 21, 2013).  The disclosure of any standstill agreements or DADW provisions is especially crucial here, where the Company apparently did not conduct any market check at all, ignored a potential counterparty's overtures, and rapidly negotiated a price with a single unsolicited bidder.

60.     The Proxy states that the April 19, 2019 meeting included "Evercore, financial advisor to NRCG," but fails to disclose how Evercore was acting as a financial advisor on April 19, 2019 when it was not "formally engaged" until April 25, 2019, and had not provided financial advisory or other services to the Company during the two-year period leading up to the Proposed Transaction.  This information is material to shareholders deciding how to vote on the Proposed Transaction because it implies that Evercore may have been acting in an informal capacity, perhaps because it was engaged by other interested parties, such as JFL Partners.

61.     The Proxy states that Baumgardner "reminded" the Board that he had previously served in numerous management roles at US Ecology – including as a director on US Ecology's Board and as US Ecology's President, CEO, COO, and CFO – but fails to disclose when Baumgardner initially disclosed his connection with US Ecology to the Board, and further fails to disclose whether this potential conflict was discussed when the Board directed him to continue to engage US Ecology at its April 3, 2019 Board meeting, or whether the Board considered these extensive connections when it appointed him as a member of the Transaction Committee.  This information is material to shareholders deciding how to vote on the Proposed Transaction because these prior connections implicate the possibility of direct and long-standing conflicts of interest.

62.     The Proxy states that the Board discussed "other opportunities available to NRCG, including potential acquisitions," on May 30, 2019, but fails to disclose the substance of the discussion of these "other opportunities," whether NRCG had received any interest from competing counterparties at that time, and whether NRCG's Board, Management, counsel, or financial advisors

had discussed conducting a market check, and why it (apparently) resolved not to conduct such a check.  This information is material to shareholders deciding whether to vote in favor of the Proposed Transaction because Evercore's fairness analysis is a "pale substitute for the dependable information that a canvas of the relevant market can provide."  *Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1287 (Del. 1989).

63.     The Proxy states that Shor informed US Ecology on June 2, 2019 that NRCG would not continue to engage US Ecology at US Ecology's valuation of $11.05 per share of NRCG common stock but fails to disclose whether Shor suggested an alternative valuation and, if so, what that valuation was.  This information is material to shareholders deciding how to vote on the Proposed Transaction because Shor provided the $12.00 per share amount just two days later, after learning that Company A was interested in a potential transaction involving the Company.  If Shor had previously suggested an alternative valuation of $12.00 or more per share of NRCG common stock, for example, a reasonable investor would be left wondering why he had not increased (and had potentially even reduced) the amount sought.

64.     The Proxy states that Company A's June 4, 2019 made a proposal to purchase the NRCG Common Stock held by the JFL Entities but fails to disclose what proportion of NRCG's outstanding equity was encompassed by NRCG Common Stock held by the JFL Entities at the time, and further fails to disclose the amount of consideration per share that was contemplated by Company A's proposal.  This information is material to shareholders deciding how to vote on the Proposed Transaction because JFL Entities was acting as a controlling shareholder.  Further, because Company A also indicated that it would be interested in purchasing the Company outright, the amount it was willing to pay to acquire the NRCG common stock held by JFL Entities bears directly on the value that the Company's public shareholders may have stood to receive in an alternative transaction.  Especially where, as here, the Company did not conduct any market check, an independent third-

party potential counterparty's valuation of the Company is certainly material to the Company's public shareholders.

65.   The Proxy states that Company A indicated in a telephonic meeting with representatives of the JFL Entities that Company A was "highly interested" in pursuing an acquisition and may be interested in acquiring "all of the outstanding equity interests of NRCG" but fails to identify the "representatives of the JFL Entities" who were party to this discussion and further fails to disclose whether Company A's acquisition proposal contemplated a specific amount of consideration per share.  This information is material to shareholders deciding how to vote on the Proposed Transaction because several of the JFL Entities partners are members of the Board, and in fact served on the Transaction Committee.  Moreover, any shareholder would wonder how Company A valued the Company on June 4, 2019 in light of Shor suggesting the $12.00 per share valuation to US Ecology on June 5, 2019, and US Ecology's willingness to increase its proposed purchase price to that suggested $12.00 valuation on June 6, 2019 on the condition of exclusivity.

66.   Further, the Proxy fails to disclose whether Shor informed the other persons present at the June 6, 2019, Board Meeting that he had *already* informed US Ecology about Company A's unsolicited proposal and instructed US Ecology that it would need to increase its proposed valuation to at least $12.00 per share.  This information is material to shareholders deciding how to vote on the Proposed Transaction because the facts disclosed strongly implicate the possibility that Shor was steering the Transaction Committee towards the $12.00 per-share valuation.

**B.   The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

67.   The Proxy also omits material information that renders Evercore's Fairness Analysis materially misleading.

68.   The Proxy describes the Fairness Opinion and the various valuation analyses that Evercore performed to render its opinion but fails to provide enough information regarding the

necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion. Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations, and Evercore's potential conflicts of interest. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate Evercore's opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

69.    With respect to the US Ecology Organic Growth Projections, the US Ecology Projections Including Inorganic Growth, the US Ecology-Prepared NRCG Unaudited Financial Projections, the NRCG Unaudited Financial Projections, and the NRCC-Prepared US Ecology Unaudited Financial Projections, the Proxy fails to provide all of the financial projections provided by management with regard to the fairness analyses, for fiscal years ending 2019 through 2023, for the following items: (i) Taxes (or tax rate), (ii) Stock-based compensation expense, (iii) Changes in net working capital, (iv) Capital expenditures, and (v) Any other line items used in the calculation of unlevered free cash flow. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

70.    Regarding Evercore's *Discounted Cash Flow Analysis*, ("DCF") the Proxy omits (i) the actual terminal values used in the DCF analysis for both the analyses using both the *Perpetuity Growth Methodology* and the *EBITDA Multiple Methodology*, (ii) the basis and rationale for Evercore's selection of perpetuity growth rates and terminal multiples (including why Evercore

selected a different range of multiples for NRCG than for US Ecology), (iii) the total number of outstanding shares of the Company and how the DCF accounted for preferred stock and whether the DCF assumed preferred stock was equivalent to common stock, and (iv) a full sensitivity table disclosing the entire range of discount rates, growth rates, projected unlevered free cash flows, and implied enterprise valuations. The actual terminal values are an essential component of any cash flow analysis and the assumptions that a banker relies on in deriving these values are also essential. It is also misleading to disclose the range of implied enterprise values is misleading without disclosing how those values are sensitive to the range of perpetuity growth rates, terminal multiples, and discount rates, particularly when shareholders are being compensated with the acquiror's stock instead of cash. A sensitivity table disclosing the full range of implied relative equity values per share is especially important because the Company did not perform a market check to determine the Company's value, and the implied enterprise value range derived in the DCF analyses (*i.e.,* $12.84 to $16.91 based on the Perpetuity Growth Method and $15.35 to $19.83 based on the EBITDA Multiple Method) suggest that the approximately $12.00 per share Merger Consideration is plainly inadequate. Notwithstanding Evercore's *Implied Relative Equity per Share*, the DCF analysis conclusions strongly suggest the Merger Consideration of combined company stock with a trading value of approximately $12.00 per share of NRCG common stock does not fairly compensate the Company's public shareholders for their stock because the Company's public shareholders cannot readily obtain the implied equity value of their stock in the combined company, especially in light of Company A's apparent willingness to make a cash purchase all of the Company's outstanding equity.

71.     All of this information is material to NRCG shareholders, and the omission of this information renders the summary of Evercore's *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key

choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness

Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate,

and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value.  For example, a change in
> the discount rate by one percent on a stream of cash flows in the billions of
> dollars can change the discounted cash flow value by tens if not hundreds
> of millions of dollars….This issue arises not only with a discounted cash
> flow analysis, but with each of the other valuation techniques.  *This dazzling
> variability makes it difficult to rely, compare, or analyze the valuations
> underlying a fairness opinion* **unless full disclosure is made of the various
> inputs in the valuation process, the weight assigned for each, and the
> rationale underlying these choices**. The substantial discretion and lack of
> guidelines and standards also makes the process vulnerable to manipulation
> to arrive at the "right" answer for fairness.  This raises a further dilemma in
> light of the conflicted nature of the investment banks who often provide
> these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders

cannot: (i) evaluate for themselves the reliability of Evercore's *Discounted Cash Flow Analysis*, (ii) make a

meaningful determination of whether the implied equity value ranges properly value the Company and US

Ecology or were the result of an unreasonable judgment by Evercore, or (iii) make an informed decision

regarding whether to vote in favor of the Proposed Transaction.

72.     Regarding Evercore's *Selected Public Company Trading Analysis*, the Proxy fails

to disclose the individual enterprise values and multiples for each of the selected companies.  Without

this information, it is impossible to determine whether Evercore included outlier companies that

should not have been selected, and it is impossible for the Company's public shareholders to replicate

the analysis after removing these outliers.  *See, e.g., In re PNB Hldg. Co. S'holders Litig.*, 2006 Del.

Ch. LEXIS 158, 2006 WL 2403999, at *25 n.125 (Del. Ch. Aug. 18, 2006) (rejecting comparable

companies analysis where the "comparable publicly-traded companies all were significantly larger

than [the subject company], with one having total assets of $587 million as compared to [the subject

company's] assets of $216 million"); *Rosenblatt v. Getty Oil Co.*, 1983 Del. Ch. LEXIS 570, 1983

WL 8936, at *26 (Del. Ch. Sept. 19, 1983) (rejecting analysis that used "smaller oil and gas producing companies as opposed to a major integrated company such as [the appraised company]"), *aff'd,* 493 A.2d 929 (Del. 1985).  Without the individual multiples, providing mean and median multiples is misleading because it is impossible to determine whether an analysis that was limited to the selected companies that were most similar to NRCG would have derived a substantially greater valuation of the Company.  Moreover, the range of multiples that Evercore selected in valuing NRCG depart significantly from the companies that were actually included in the analysis: (i) the range of 2019E Adjusted EBITDA multiples that Evercore selected for the Company (7.50x to 11.50x) ranges from the Benchmark multiple's *low-end* to its mean; (ii) the entire range of 2019E EPS multiples that Evercore selected for the Company (20.00x to 25.00x) is below the mean and median Benchmark 2019E EPS multiples (26.5x and 26.9x, respectively), and (iii) the entire range of 2019E Normalized Tax Adjusted EPS multiples that Evercore selected for the Company (23.50x to 28.00x) is similarly below the mean and median Benchmark 2019E Normalized Tax Adjusted EPS multiples (28.6x and 28.0x, respectively).  Moreover, while Evercore apparently selected a range of multiples that may have *undervalued* NRCG, it selected a *different* range of multiples for US Ecology.  Without knowing the individual multiples for each of the selected companies, it is impossible to determine whether Evercore's analysis was, in fact, "working backwards" to ensure that the *Selected Public Company Trading Analysis* achieved the "right" result.  Again, notwithstanding Evercore's *Implied Relative Equity per Share* range, the *Selected Public Company Trading Analysis* conclusions strongly suggest the Merger Consideration of combined company stock with a trading value of approximately $12.00 per share of NRCG common stock does not fairly compensate the Company's public shareholders for their stock because the Company's public shareholders cannot readily obtain the implied equity value of their stock in the combined company, especially in light of Company A's apparent willingness to make a cash purchase all of the Company's outstanding equity.

23

73.     With respect to Evercore's *Selected Transactions Analysis*, the Proxy fails to disclose the individual enterprise values and multiples for each of the selected transactions.  Without this information, it is impossible to determine whether Evercore included outlier companies that should not have been selected, and it is impossible for the Company's public shareholders to replicate the analysis after removing these outliers.  Again, it is impossible to determine whether the range of multiples that Evercore selected for the Company provides a fair picture of the Company's value, particularly where Evercore included transactions that were announced almost a decade ago.

74.     With respect to Evercore's *Premiums Paid Analysis*, the Proxy states that Evercore "reviewed 64 all-stock transactions and announced bids for control of U.S. public targets with an aggregate transaction value between $500 million and $1.5 billion announced since January 1, 2010," and "reviewed 20 all-stock transactions and announced bids for control of U.S. public targets with an aggregate transaction value between $850 million and $1.2 billion announced since January 1, 2019," and "calculated the premiums paid as the percentage by which the per share consideration paid or proposed to be paid in each such transaction exceeded the closing market prices per share of the target companies one day, one week, and one month prior to the announcement of each transaction."  The Proxy fails to disclose why Evercore limited its analysis to all-stock transactions, and whether it was instructed to do so by the Company.  The Proxy further fails to disclose the individual premiums paid in each transaction.  The Proxy further fails to disclose whether Evercore made any attempt to account for "disturbances" to stock price that occurred prior to the announcement of a transaction, for example a "jump" in stock price that occurred because a company announced that it was anticipating a merger before any merger was, in fact, finalized.  *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia

stock before this date were less than fully confident ones.").  All of this information is material to shareholders and the disclosure of the quartile results of the *Premiums Paid Analysis* without this information renders the Proxy false and misleading.

75.     With respect to Evercore's *Equity Research Analyst Price Targets* analysis, the Proxy states that "Evercore reviewed selected public market trading price targets" and that the "range of selected equity research analyst price targets per share of NRCG Common Stock was $12.00 to $15.00," and that the "range of selected equity research analyst price targets per share of ECOL Common Stock was $59.00 to $72.00."  The Proxy fails to disclose the actual price targets observed and fails to summarize the price targets in a meaningful way, and does not provide any measurement of central tendency.  Without the individual price targets themselves, a quartile, quintile, or decile summary, or at a minimum some measurement of variance, it is impossible to tell whether the range fairly summarizes the data observed.  Again, notwithstanding Evercore's *Implied Relative Equity per Share* range, the *Equity Research Analyst Price Targets* conclusions strongly suggest the Merger Consideration of combined company stock with a trading value of approximately $12.00 per share of NRCG common stock does not fairly compensate the Company's public shareholders for their stock because the Company's public shareholders cannot readily obtain the implied equity value of their stock in the combined company, especially in light of Company A's apparent willingness to make a cash purchase all of the Company's outstanding equity.

76.     If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that

"half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading

77.    The Proxy also fails to fully disclose all potential conflicts-of-interest for Evercore. This conflict of interest information is material to shareholders because it directly informs shareholders as to how much weight they should give to Evercore's Fairness Opinion.

78.    The Proxy discloses that Evercore's fee is "approximately $3 million," that "Evercore and its affiliates have not been engaged to provide financial advisory or other services to NRCG" during the two-year period prior to the date of the opinion, and that "Evercore may provide financial advisory or other services to NRCG, US Ecology and Holdco in the future," but fails to disclose (i) why the Proxy states that Evercore was present at a meeting as the Company's financial advisor before it was actually engaged by NRCG, (ii) whether Evercore was providing financial advisory services to the JFL Entities at that time, and (iii) whether there are any services that are, in fact, mutually understood to be contemplated at this time between Evercore, US Ecology, and/or Holdco.

79.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

80.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

81.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

82.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

83.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

84.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

85.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by

virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

86.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

87.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

88.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

89.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

92.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

94.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

97.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 1, 2019

                                          **MONTEVERDE & ASSOCIATES PC**

                   By:  */s/ Juan E. Monteverde*
                                          Juan E. Monteverde (JM-8169)
                                          The Empire State Building
                                          350 Fifth Avenue, Suite

**OF COUNSEL:**                            4405 New York, NY 10118
                                          Tel:(212) 971-1341

**ADEMI & O'REILLY, LLP**               Fax:(212) 202-7880
Guri Ademi                                 Email: jmonteverde@monteverdelaw.com
Jesse Fruchter
3620 East Layton Avenue                        *Attorneys for Plaintiff*
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
           jfruchter@ademilaw.com

*Attorneys for Plaintiff*